IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CANDACE M. FITCH | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:04-CV-615-Y |
| | § | |
| RELIANT PHARMACEUTICAL, LLC | § | |

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pending before the Court is the motion for summary judgment [doc. # 21] of defendant Reliant Pharmaceutical, LLC (Reliant), filed April 5, 2005. After consideration, the Court GRANTS the motion.

I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises from an employment dispute. Plaintiff Candace M. Fitch was employed by Reliant as a professional sales representative (PSR). (Plf.'s App. at 12-14; Def.'s App. at 28.) PSRs make sales calls on doctors and give them drug samples. They must carefully document their visits and keep track of their samples. To comply with the Prescription Drug Marketing Act (PDMA), PSRs' call reports are periodically audited. At first, Reliant was pleased with Fitch's work. In 2001, Fitch won the President's Award for being in the top 2% of sales for Reliant. (Plf.'s App. at 101.) Fitch's supervisor was Mike Sampeck, who was a district manager.

At some point, Fitch's relationship with Sampeck began to deteriorate. (Plf.'s App. at 38.) On December 8, 2001, Fitch sent a letter to Joe Ferraro, Fitch's regional manager and Sampeck's boss, complaining about Sampeck. (Plf.'s App. at 212.) In the letter, she complained that she had "been asked to do things [by Sampeck] in my territory that I feel is unethical and can be detrimental to my territory." She focused on Sampeck's instructions regarding a Reliant coupon program.

Under the program, PSRs were to get doctors to write prescriptions for Lescol XL "on any person." The PSRs would then take the prescriptions to a pharmacy, get them filled free with a Reliant coupon,[1] and then return the filled prescriptions to the doctors who could give them to their indigent patients. Fitch told Ferraro that she felt the coupon program would "not . . . benefit my territory" and that her performance evaluation was too heavily based on her numbers under the coupon program. She also complained about "friction" Sampeck fostered between herself and her "counterpart" and about Sampeck's poor work habits, e.g., incorrect reports and a pattern of tardiness, leaving early, and absenteeism. She concluded the letter by saying she had "made an excellent choice with Reliant." (Plf.'s App. at 213.)

Ferraro contacted Sampeck about the letter. After Sampeck explained the coupon program to him, Ferraro did not see anything inappropriate about it. To double check Sampeck's description of the program, Ferraro contacted another PSR who had done well on the program. The PSR verified Sampeck's version. Ferraro decided that Fitch's letter was the result of personality conflicts between Sampeck and Fitch. Ferraro counseled Sampeck on how to work better with Fitch. He received no further complaints from Fitch regarding Sampeck or the coupon program.[2] (Def.'s App. at 24.)

About ten months later, on September 13, 2002, Fitch's territory was transferred to the supervision of another district manager, Doug Tate. (Def.'s App. at 25, 28; Plf.'s App. at 54.) Fitch

---

[1] Apparently, Reliant printed coupons in newspapers, which consumers could redeem at pharmacies with a valid prescription for a free supply of Lescol XL, a Reliant cholesterol drug.

[2] Although Fitch stated that she complained again to Ferraro about Sampeck and the coupon program, she could not remember when she did so. (Plf.'s App. at 40.)

2

continued to refuse to participate in the coupon program; however, Fitch conceded that neither Ferraro nor Tate asked her to do anything illegal. (Plf.'s App. at 35, 43.) Shortly after Tate became Fitch's supervisor, and during a routine audit of Fitch's call reports, Tate discovered they did not indicate whether any samples were left with the doctors and that some doctor signatures on the call reports did not match the name of the doctors listed on the reports.[3] (Def.'s App. at 29.) In the fall of 2002, Tate met with Fitch and Sampeck, who was there as a witness, to discuss the PDMA compliance problems. Fitch's husband was also at the meeting. Fitch did not dispute the audit's results, and Tate told her that they would "be proceeding with . . . termination." Fitch was placed on paid administrative leave pending an investigation. In November 2002, Fitch was allowed to return to work under Tate's supervision, but was required to complete additional training on the PDMA. Fitch completed the additional training.

Problems with Fitch's performance arose soon after she returned to work. Tate began receiving complaints from doctors' offices that Fitch was not showing up for appointments. (Def.'s App. at 28-30.) One doctor wrote to Tate and notified him that Fitch would no longer be allowed to schedule breakfast or lunch meetings with its doctors because she had repeatedly failed to show up for such appointments.[4] Tate also began noticing problems with Fitch's expense reports. Principally, he discovered that Fitch submitted a FedEx receipt for a package FedEx had no record of shipping and that she had submitted a postage receipt with a time stamp for a time Fitch had

---

[3] Fitch admitted that the signatures were not the doctors' signatures because she had the physician's assistants sign the forms instead of the doctors themselves. (Def.'s App. at 17.)

[4] Fitch asserts that these meetings were not on her calendar and that she can't remember if she missed scheduled breakfast and lunch meetings with doctors. (Plf.'s App. at 44-46.)

previously recorded she was in a doctor's office across town. Based on these issues and her prior problems, Tate concluded that Fitch should be fired and made that recommendation to Ferraro. Ferraro approved of the recommendation and, presumably, communicated that to human resources. (Def.'s App. at 24.) Tate averred that Sampeck "played no role in [this] decision." (Def.'s App. at 30.)

In January 2004, Ferraro received a call from Marjorie Adams-Franzblau, who was the senior counsel for Reliant. (Plf.'s App. at 120, 197.) Adams-Franzblau told Ferraro that Fitch was to be fired. Adams-Franzblau and the general counsel made this decision together. (Plf.'s App. at 204-05.) Ferraro called Fitch and told her "that her employment with Reliant was being terminated effective immediately." (Plf.'s App. at 53, 121.) When Fitch asked what the reasons were for her termination, Ferraro referred her to human resources.

Fitch brought suit in state court against Reliant and Sampeck for unlawful termination, defamation, and tortious interference with her business relations. Once the action was removed to federal court, Reliant filed a motion for summary judgment seeking judgment as a matter of law on all of Fitch's claims.[5] Fitch objects to Ferraro's, Sampeck's, and Tate's affidavits, which are in an appendix to Reliant's motion for summary judgment and constitute the bulk of Reliant's summary-judgment evidence. For the reasons stated in Reliant's reply, these objections are overruled. (Def.'s Reply at 5.)

---

[5]Initially, Fitch brought suit in state court against Reliant and Sampeck, individually. Reliant removed the action to this Court on the basis of diversity jurisdiction. Reliant argued that because Sampeck had been improperly joined, complete diversity between the remaining parties existed. Fitch did not challenge the removal; thus, Sampeck is not a party to this action. *See Jewell v. Dudley L. Moore Ins., Inc.*, 872 F. Supp. 1517, 1520 (M.D. La. 1995).

4

## II. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party moving for summary judgment has the initial burden of demonstrating that it is entitled to a summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party need not produce evidence showing the absence of an issue of fact with respect to an issue on which the nonmovant bears the burden of proof, however. Rather, the moving party need only point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmovant's claim. *See id.* at 323-25.

When the moving party has carried its summary judgment burden, the nonmovant must go beyond the pleadings and by its own affidavits or by the depositions, answers to interrogatories, or admissions on file set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e). This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions or by only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

In making its determination on the motion, the Court must look at the full record in the case. FED. R. CIV. P. 56(c); *see Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992). Instead, parties should "identify specific

evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

### III. FITCH'S CLAIMS

#### A. WRONGFUL TERMINATION

Fitch asserts that she was wrongfully terminated because she refused to perform an illegal act, i.e., she failed to fully participate in the coupon program as requested by Sampeck. Fitch argues that the coupon program violated the PDMA. The PDMA provides that "no person may sell, purchase, or trade, offer to sell, purchase or trade, or counterfeit any coupon." *See* 21 U.S.C.A. § 353(c)(2) (West 1999). Fitch asserts that Sampeck's instructions about the coupons constituted a prohibited purchase, trade, and counterfeit of a coupon. For the limited purposes of this discussion, the Court will assume, without deciding, that the coupon program violated the PDMA and constituted an illegal act.

In Texas, it is well-established that an at-will employee, such as Fitch, may be terminated without cause. However, there is a narrow exception that prohibits the discharge of an employee "for the *sole* reason that the employee refused to perform an illegal act" at least when the "laws of [Texas] and the United States which carry criminal penalties" are implicated. *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex. 1985) (emphasis added). The employee has the burden of proving, by a preponderance of the evidence, that the discharge was for no reason other than the employee's refusal to perform an illegal act. *Id.* The *Sabine-Pilot* exception does not apply when the wrongful motivation is a producing cause of rather than the sole reason for the discharge. *See Paul v. P.B.-K.B.B., Inc.*, 801 S.W.2d 229, 230 (Tex. App.—Houston [14th Dist.] 1990, writ denied).

7

In other words, an employer who fires an employee both for refusing to perform an illegal act and for a legitimate reason cannot be liable for wrongful discharge under *Sabine Pilot*. *See Tex. Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 633 (Tex. 1995).

The evidence shows that Reliant had multiple reasons to fire Fitch, including missing sales appointments, doctors' complaints, and improper call reports. Indeed, there is no evidence that the sole reason for Fitch's firing was her refusal to participate in the coupon program. Additionally, Fitch stated that neither Tate, who was her supervisor at the time she was fired, nor Ferraro ever asked her to do anything illegal. (Plf.'s App. at 43.) Other than Fitch's subjective belief (Plf's App. at 56-57), there is no evidence that Sampeck was involved in the decision to fire Fitch. Further, Fitch was fired over one year after she sent Ferraro the letter complaining about the coupon program.

Fitch argues that Reliant's failure to follow its own progressive-discipline policy in her case implies that the sole reason for her discharge was her refusal to perform an illegal act. But Reliant's policy stated that it was not mandatory, that it was not a progressive policy, and that all employees were at-will employees:

> [Reliant] has the right to determine what disciplinary action is appropriate, based on the facts of each case. Not all available forms of discipline are appropriate to every disciplinary situation, and the Company is not required to treat each form of discipline as a step in a series to be followed with an employee before discharge.
>
> [Reliant's] practice of employee discipline includes, but is not limited to, verbal warnings, written warnings, suspensions (with and without pay), and termination. *Any, some, or all of these may be used in any order whenever the Company deems the circumstances warrant the action.* Accordingly, circumstances may sometimes warrant immediate termination.
>
> [Reliant's] practice of employee discipline does not imply "progressive" discipline is required or employment may be terminated only for cause. (Plf.'s App. at 232.)

Fitch has provided no evidence to support her contention that she was fired for the *sole* reason that she did not participate in the coupon program. Thus, her claim fails.

B. DEFAMATION

Fitch next asserts that Sampeck "made false statements about [Fitch's] work abilities and actions taken by [Fitch] while working for [Reliant]," which constitute "libel and/or slander." (Plf.'s Petition at 3.) Specifically, Fitch stated at her deposition that Sampeck told Ferraro[6] and Tate that she was not performing, not working, and falsifying records and signatures. (Plf.'s App. at 58-59.) Further, Fitch stated that Sampeck told Pat Scott, a PSR, that Fitch was not working her territory and that Sampeck told Claudia Sanchez, also a PSR, that Fitch was not working her territory and that she was falsifying records. (Plf.'s App. at 63, 66.) In an affidavit she created after her deposition and after she "refreshed [her] recollection," she expanded her defamation claims to include statements she was told Sampeck allegedly made to other PSRs that Fitch was "lazy," did not work, was not a good employee, was never a "real" PSR, and was fired for stealing drugs. She also added statements she was told Sampeck made to doctors she had called on that Fitch was fired because she had stolen drugs and had done "illegal stuff." (Plf.'s App. at 1-6.) The statements added in Fitch's post-deposition affidavit are improper and cannot be used to contradict Fitch's statements in her deposition limiting her claims of defamation to Sampeck's statements to Ferraro and Tate. *See Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir.) (stating party, who has been examined at length in deposition, cannot create "sham" fact issue by submitting affidavit to contradict deposition testimony), *cert. denied*, 531 U.S. 1073 (2001).

---

[6]Fitch stated she could not remember what statements Sampeck made to Ferraro. (Plf.'s App. at 59.)

9

Defamation encompasses libel—defamation through a writing—and slander—defamation through oral statements or other conduct. *See* 20 WILLIAM V. DORSANEO III, TEXAS LITIGATION GUIDE § 333.01[1][a] (2005). Because Fitch's summary-judgment evidence limits Sampeck's defamation to oral statements he made to others, her claim is necessarily one for slander. Slander is a defamatory statment that is orally communicated or published to a third party without legal excuse. *Burch v. Coca-Cola Co.*, 119 F.3d 305, 323 (5th Cir. 1997), *cert. denied*, 522 U.S. 1084 (1998). A statement is slanderous per se if it affects a person injuriously in her office, profession, or occupation. *Estate of Martineau v. ARCO Chem. Co.*, 203 F.3d 904, 914 (5th Cir. 2000).

Fitch limited any statements by Sampeck to Ferraro and Tate to those he made during the 2002 meeting with Fitch, Fitch's husband, and Tate. (Plf.'s App. at 61.) Such statements are entitled to a qualified privilege because they were made to persons conducting a performance review of Fitch and during the course of an investigation following a report of employee wrongdoing. *See Burch*, 119 F.3d at 323; *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). To defeat this qualified privilege, Fitch must establish that Sampeck made the statements with actual malice, i.e., Sampeck published the defamatory statements either with knowledge of their falsity or with reckless disregard as to their truth. *Burch*, 119 F.3d at 323, 324 n.20; *Randall's*, 891 S.W.2d at 646. Fitch fails to point to specific evidence in the record to show actual malice; thus, Reliant is entitled to summary judgment on these statements.

Similarly, Reliant is entitled to summary judgment on Fitch's defamation claim regarding Sampeck's alleged statements made to Scott and Sanchez. Fitch's evidence of these statements consists solely of her hearsay statements at the deposition and her hearsay statements in her post-deposition affidavit, which were previously determined to be improper. Evidence on summary

10

judgment may be considered only to the extent it is not based on hearsay or evidence that would be excludable at trial. *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995). Fitch's deposition testimony about what Scott and Sanchez told her Sampeck allegedly said is hearsay and cannot defeat summary judgment.

## C. TORTIOUS INTERFERENCE

Fitch argues that Sampeck tortiously interfered with her employment with Reliant, which made "it more difficult for her to perform her job by recommending her termination in November 2002." (Plf.'s Resp. at 31.) Although Fitch stated in her state-court petition that Sampeck's actions constituted "tortious interference with *prospective* employment relations and contracts" (Plf.'s Pet. at 3) (emphasis added), in response to Reliant's summary-judgment motion, Fitch only defends her claim that Sampeck interfered with her *existing* employment contract with Reliant. (Plf.'s Resp. at 31, 33.) Thus, that theory also will be this Court's focus. *Cf. Forsyth*, 19 F.3d at 1537 (holding, to defeat summary judgment, parties must identify specific record evidence and precisely articulate how that evidence supports the claim). But this claim, likewise, fails.

To prevail on a claim of tortious interference with an existing contract, Fitch must show: (1) there is an existing contract subject to interference,[7] (2) an intentional and willful interference, (3) that proximately caused damage, and (4) actual damage or loss. *See Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998). Because Sampeck, as an agent of Reliant, is the third party who allegedly induced the breach, Fitch must show that Sampeck acted solely in his own interests. *See id.* at 456-57.

---

[7]In Texas, employment at will is sufficient to create an existing contract subject to interference. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 688 (Tex. 1989)

11

Under this theory, it is problematic for Fitch that Sampeck, the alleged third party, is not a party to this action. *See, e.g., Harris-Childs v. Medco Health Solutions, Inc.*, No. 4:03-CV-077-Y, 2005 WL 562720, at *8 (N.D. Tex. Mar. 10, 2005). Further, there is no direct evidence, and Fitch does not point to any in the record, that shows Sampeck was acting solely in his own interest.[8]

## IV. CONCLUSION

Fitch has failed to raise a fact issue to defeat Reliant's summary-judgment motion. Thus, Reliant is entitled to judgment as a matter of law.

SIGNED February 13, 2006.

```
                                    TERRY R. MEANS
                                    UNITED STATES DISTRICT JUDGE
```

---

[8] Fitch attempts to raise a fact issue here by pointing out that Sampeck was acting in his own interest because he failed to follow Reliant's progressive-discipline policy before recommending Fitch's termination. (Plf.'s Resp. at 33.) As explained above, the discipline policy was neither progressive nor mandatory.

12